FILED
BILLINGS DIV.
2011 JUN 30 PM 2 25
PATRICK E. DUFFY, CLERK
BY ___
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

UNITED STATES OF AMERICA,

Plaintiff/Respondent,

vs.

ERIC JAMES SCHULTZ,

Defendant/Movant.

Cause No. CR 10-45-BLG-RFC
CV 11-64-BLG-RFC

ORDER DENYING § 2255 MOTION AND DENYING CERTIFICATE OF APPEALABILITY

On June 7, 2011, Defendant/Movant Eric James Schultz ("Schultz"), a federal prisoner proceeding pro se, filed a motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Schultz also filed a brief in support and several exhibits.

## I. Preliminary Screening

The motion is subject to preliminary review to determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts.

## II. Background

Schultz invested money in a high-yield, short-term investment scheme. He realized no gain, but he got his initial investment back. He then began accepting money from other investors, telling them – verbally, though he did not put it in writing – that he would invest their money in the same fund. When he told them he would invest their money, however, he did not actually intend to do it. He intended to, and did, use it himself. Although he told his investors that they would either get an astronomical return or, at the very least, they would get all of their money back, they did not get an astronomical return. They also did not get all of their money back. Change of Plea Hr'g (doc. 44) at 26:22-32:19; Offer of Proof (doc. 8) at 4-7.

Schultz, with the advice of attorneys Larry Jent and Herman A. "Chuck" Watson, cooperated with investigators and prosecutors from the Montana State Auditor's office and the United States in an investigation of the investment scheme. He received use immunity for his statements only. Eventually the parties arrived at an agreement that Schultz would be criminally charged because he lied to investors about what he would do with their money and because he used their money for his own purposes instead. Schultz agreed to plead guilty and pay restitution. Exhibits 510, 533 (doc. 49-2); Plea Agreement (doc. 7) at 2-9 ¶¶ 1-8.

Schultz was indicted on April 22, 2010, on one count of wire fraud, a violation

of 18 U.S.C. § 1343 (Count 1); one count of money laundering, a violation of 18 U.S.C. § 1957(a) (Count 2); and a forfeiture allegation. Indictment (doc. 1). A summons was issued the same day, and Schultz was ordered to appear on May 21, 2010. Summons (doc. 2). On May 19, 2010, retained counsel Larry Jent moved to vacate the initial appearance because the parties had reached a plea agreement and Schultz was ready to enter a guilty plea. Mot. to Vacate Initial Appearance (doc. 4) at 1. The Plea Agreement (doc. 7) and Offer of Proof (doc. 8) were filed on May 20 and 21, 2010, respectively.

On May 21, 2010, United States Magistrate Judge Carolyn S. Ostby, with Schultz's written consent (doc. 9), conducted a change of plea hearing. Schultz pled guilty to both counts of the Indictment, and a trial of the forfeiture allegation was set. On June 23, 2010, the United States moved to dismiss the forfeiture allegation on the grounds that restitution would adequately redress the victims' losses. Mot. to Dismiss (doc. 18) at 2. The motion was granted on June 24, 2010. Order (doc. 19).

A presentence report was prepared. The probation officer started from a base offense level of 7, U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1), and calculated a 14-level enhancement because the loss was more than $400,000 but less than $1,000,000, *id.* § U.S.S.G. § 2B1.1(b)(1)(H), as well as a one-point enhancement because Schultz was convicted of money laundering. *Id.* § 2S1.1(b)(2)(A). Schultz received a three-

level downward adjustment for acceptance of responsibility. *Id.* § 3E1.1. His total offense level was 19, and his criminal history category was I. In addition to its fulfilled promise not to charge Schultz with other crimes, the United States moved to reduce Schultz's sentence under U.S.S.G. § 5K1.1, seeking a two-level departure that would produce an advisory guideline sentencing range of 24-30 months. Mot. to Reduce (doc. 22) at 7 (under seal).[1] On September 21, 2010, Montana's Deputy Securities Commissioner and her counsel submitted a letter expressing gratitude for Schultz's assistance in their investigation. Letter (doc. 26).

On September 22, 2010, at the sentencing hearing, a four-level downward adjustment was made to reflect Schultz's assistance to authorities. He was sentenced to serve 20 months in prison, to be followed by a three-year term of supervised release. He must pay $850,000 in restitution. Judgment was entered the same day. Sentencing Tr. at 30:17-32:25; Judgment (doc. 28) at 2-3, 5.

Schultz was granted leave to file an out-of-time appeal, Order (doc. 34), but, on his motion, the appeal was dismissed on May 18, 2011. 9th Cir. Order (doc. 46).

Schultz timely filed his motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 on May 27, 2011. Mot. § 2255 (doc. 49) at 35; 28 U.S.C. §

[1] The United States said at sentencing that "[t]he details of the 5K are not particularly confidential or secret." Sentencing Tr. (doc. 39) at 9:2-3.

2255(f)(1).

## III. Allegations and Analysis

Schultz's motion and brief allege violations of his Sixth Amendment right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984), governs. First, Schultz must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. Second, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### A. Guilty Plea

Schultz asserts that, had his lawyers faithfully defended his position, he would not have pled guilty because he is innocent. Br. at 2-23. He points to three documents, Exhibits 530, 531, and 532, which he claims are "exculpatory" and "directly refute the charges of Solicitation and Misrepresentation." Br. at 11. To show that he pled guilty due to ineffective assistance, he must show not only deficient performance by counsel but also "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

*Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

The Indictment alleged that Schultz fraudulently told investors that he would place their money in "an extraordinarily high yield investment scheme." Indictment at 3. In Exhibits 530, 531, and 532, the personal pronouns become slippery, but it is clear that "Intermediary" means Schultz's side of the transaction and "Beneficiary" means the Investor's. The documents say, in effect, that the Beneficiary will give Schultz a sum of money, and Schultz will return it in full – or, if he has more, he will return up to 2000% of the Beneficiary's original investment – within 30 days of nonperformance. Nonperformance of what? "[N]onperformance by Intermediary's resource's being due October 5, 2008 pertaining to the effect of all other obligations and liabilities of Intermediary to the Beneficiary, fixed or contingent, due or to become due, direct or indirect, now existing or hereafter and howsoever arising or incurred under the Contract." Ex. 531 at 1 para. I. Or, to put the same thing a little more clearly, the contract does not say.[2]

Jurors, prosecutors, and criminal defense attorneys must read such documents through the lens of common sense. If Exhibits 530, 531, and 532 accurately reflected everything involved in the relationship between Schultz and his victims, then none of

---

[2] Counsel characterized the documents as "official sounding but meaningless jargon." Mot. § 2255 at 14 (quoting Ex. 533 at 2 ¶ 7). That is correct.

them would have given Schultz any money. Each of them would have looked at him, puzzled, and asked, "Well, why should I give it to you?"

For the "Beneficiaries," the essence of the transaction was a misrepresentation: "I will invest your money in an extraordinarily high yield investment scheme." The documents Schultz presents do not say that, but Schultz certainly did. No reasonable juror, presented with Exhibits 530, 531, and 532 as "exculpatory" evidence, would have found them to be anything other than strongly inculpatory.

To the extent any doubt about Schultz's fraud might have lingered even after the jury saw the "exculpatory," "official sounding but meaningless" documents, *see supra* note 2, Schultz's investors could have cleared it up. He does not believe they could have:

> Firstly, we look at the allegation that the investors somehow had the impression that "all, or substantially all of the monies provided by investors would be invested." There is no place in the agreements [Exs. 530, 531, and 532] which makes this claim, therefore it is a false allegation. Any argument that there were spoken ancillary agreements is also a false allegation, where by rule of parol, if any spoken promises were in fact made, the written agreement supercedes as the sole unambiguous agreement.

Br. at 12.

But, of course, the parol evidence rule applies only to the interpretation of the terms of a written contract that is *not* marred by fraud in the inducement.

"[N]otwithstanding the parol evidence rule, fraud in the inducement is provable by parol evidence," for the very good reason that "[l]imiting a jury's consideration of evidence to a written agreement creates an illogical requirement that an alleged fraud leading to the creation of the contract be demonstrated by a writing." *Savik v. Entech, Inc.*, 923 P.2d 1091, 1095-96 (Mont. 1996) (citing Mont. Code Ann. § 28-2-905, which has not been amended since at least 1979). Neither Schultz nor the written documents were the sole source of information about what he did.

Finally, Schultz complains that his attorneys' advice regarding the United States' plea offer was "an immaculate illustration of intimidation and coercion." Br. at 6-7.[3] On the contrary, it was correct and necessary legal advice. E.g., Ex. 533 at 3 ¶ 10, 4 ¶ 16, 5 ¶ 21. When a client has no defenses, his attorney must tell him so. Failure to clearly and if necessary forcefully tell the client the truth of his situation would be deficient performance. Schultz's attorneys performed competently.

Schultz claims the possibility of more serious charges, including conspiracy, did not exist, Br. at 9, but his argument is based on recent e-mail in which the prosecutor explains why he will not file a motion under Fed. R. Crim. P. 35 to further

---

[3] Schultz also complains that Watson did not tell him he had a right to be represented by appointed counsel if he decided to go to trial. Br. at 8. Schultz knew that. Plea Agreement at 10 ¶ 9(c). And Schultz says he "anticipated" he would be sentenced to probation or home confinement, Br. at 7, but he knew he could be sentenced to up to twenty years in prison. Plea Hr'g Tr. at 10:4-25, 13:5-14:16; Plea Agreement at 7 ¶ 7, 12-16 ¶ 11.

reduce Schultz's sentence. The prosecutor said, "Schultz was not part of [the] inner circle so he cannot assist as someone who was in on the investment fraud scheme disclosing admissions or secrets to which an insider would be privy." Ex. 535 at 1 (under seal). That has absolutely no bearing on Schultz's vulnerability to conviction for conspiracy rooted in the investment scheme he told his investors he would get them into. The prosecutor is merely saying that, if the offense here were a wagon wheel, Schultz was at the end of one of the spokes, and he would have made a better witness if he had been at the hub. E.g., Fed. R. Evid. 801(d)(2)(E). Nonetheless, he was on the wheel, and that meant he was vulnerable to prosecution for conspiracy.

Finally, Schultz does not contest the truth of the facts he admitted at his change of plea hearing. He said he told investors he would invest their money in a fund that would multiply their money tenfold (or more), but he did not, and he had no intention of doing what he told them he was going to do. Plea Hr'g Tr. at 28:24-29:1, 29:21-30:12, 31:11-32:19. He was undoubtedly guilty of wire fraud and money laundering.

Schultz's claim of innocence is specious. His lawyers clearly gave him good advice. His guilty plea helped him to avoid other charges, placed him in a lower advisory guideline range than if he had been convicted at trial, and resulted in a further sentence reduction to reflect his substantial assistance. Neither prong of the *Strickland/Hill* test is met. All claims challenging the quality of counsel's advice to

plead guilty, Br. at 2-23, are denied.

**B. Use Immunity**

Schultz claims he was deceived about the scope of his immunity agreement:

> It is generally known that "Use Immunity" means that, while the government may prosecute the witness for an offense related to the subject matter of the witness' testimony, the testimony itself and any "fruits" thereof may not be used against the witness in any criminal case except a prosecution for perjury arising out of the testimony.

Br. at 24 (citing *New Jersey v. Potash*, 440 U.S. 450, 451-52 (1979)). He believes he must have been deceived because the prosecutor, in the e-mail referred to above, the prosecutor wrote, "Mr. Schultz's cooperation was primarily in the nature of disclosing the details of his own financial misconduct, not in the provision of evidence against others." Ex. 535 at para. 2. As stated, Schultz did not know enough to directly incriminate others, but his cooperation was helpful to investigators in understanding part of how the scheme worked. E.g., Mot. to Reduce (doc. 22) at 4-6 (under seal).

I do not follow Schultz's reasoning as to the meaning of the e-mail. Regardless, no one could have been confused or deceived about the nature of the agreement. It stated:

> [A]ny statements made by you in any subsequent interviews with federal state or local law enforcement, or in any appearance before the Grand Jury or in trial testimony, if called upon to do so, will not be used against you in any criminal proceeding.
>
> This promise of use immunity does not extend to derivative use

> immunity, so that anything learned or developed as a result of your statements will not have the same protection as the statements themselves. This insures that our understanding is clearly limited to what statements you personally provide during your interviews with law enforcement officers or agents who will interview you about your knowledge of criminal activity, and not to evidence that may be discovered at a later time from a separate source even if that evidence may have been discovered, in whole or in part, because of the statements you have provided.
>
> This distinction between what is said by you (which cannot be used) and what is developed as a result of those statements (which can be used) is important to clarify so that the problems of *Kastigar v. United States*, 406 U.S. 441 (1972), can be avoided. You are shielded only from the use of the statements themselves and nothing more.

Exhibit 510 at 11.

Schultz points to no proceeding in which statements he made under the protection of this agreement were used against him. If there was one, it did not happen in this Court. All claims relating to the use immunity agreement, Br. at 24, are denied.

**C. "Plausible Line of Defense" at Sentencing**

Schultz had no plausible line of defense. Even if the investment scheme had been limited to blue-chip stocks, Schultz would still be guilty of the crimes charged in the Indictment, because he obtained money from investors by lying to them about what he would do with it. This claim, Br. at 25-28, is denied.

**D. "Collateral Pledged"**

Contrary to what Schultz claims, Br. at 29 (citing Ex. 531), he did not pledge collateral. U.S.S.G. § 2B1.1 Application Note 3(E)(ii) does not apply. There is no possibility that a lower sentence would have resulted if counsel had attempted to raise this issue. This claim is denied.

### E. *Santos*, *Van Alstyne*, and Loss Calculation

Schultz contends that *United States v. Santos*, 553 U.S. 507 (2008), and *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), show that the loss in his case was not correctly calculated. Br. at 30-34. He is mistaken. The cases are not adaptable to the purpose for which Schultz cites them. They also do not apply in their own terms.

Because *Santos* is a plurality opinion, some doubt ensued about its meaning. In the Ninth Circuit, *Van Alstyne* is the controlling interpretation. It holds that "'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." *Van Alstyne*, 584 F.3d at 814.

Santos operated an illegal lottery. He was indicted for the lottery and for laundering the money he received from it. But the money collected in the lottery was routinely paid out to the lottery winners and to Santos's employees to keep the lottery operating. Under those circumstances, "[e]quating proceeds with gross receipts would

. . . turn nearly every violation of the illegal lottery statute . . . into a simultaneous violation of . . . the money laundering statute." *Van Alstyne*, 584 F.3d at 810 n.6. Therefore, the plurality agreed, the term "proceeds" must be interpreted to mean profits – that is, the portion of the money brought in that was not reinvested in the scheme. Similarly, Van Alstyne's Ponzi scheme, though not a lottery, had the same structure. Money came in, and much of the same money was paid out in order to keep the scheme afloat:

> [I]ssuing distribution checks that supposedly represented generous returns on his victims' investment was a central component of the 'scheme to defraud.' Doing so directly inspired investors to send more money to Van Alstyne's funds, which could then be used to pay returns to other investors. The very nature of the scheme thus required some payments to investors for it to be at all successful.

*Van Alstyne*, 548 F.3d at 815.

Schultz did not use this cash-in, cash-out cycling model. He just took the money. He told investors he would invest all of it. He did not. On top of that, he had no reason to believe the minor portion he did invest would ever produce the returns he projected – "ten to one in sixty days," he told one investor, Presentence Report ¶ 11, "up to sixteen times the original investment" in sixty days, he told another, *id.* ¶ 12. The scheme did not generate operating expenses, and it succeeded as soon as the

investors parted with their money.[4] Schultz's scheme was not like those in *Santos* and *Van Alstyne*.

Schultz suggests that these cases have something to do with loss calculation under the advisory Guidelines. They do not. Loss is defined by the applicable guideline, U.S.S.G. § 2B1.1 Application Note 3(A). It has nothing to do with either profits or receipts obtained by the defendant. In particular, if the defendant gives other people's money to still other people (say, brokers), that money is not excluded from the loss calculation. Schultz took in at least $740,000 from investors. The amount of the loss is probably $740,000, but it is certainly at least $500,000, the amount Schultz took in minus the amount he invested as he said he would.[5] A fourteen-level enhancement applies if the loss is between $400,000 and $1,000,000. U.S.S.G. § 2B1.1(b)(1)(H). It was. Presentence Report ¶ 27. There is no error in the loss calculation.

Finally, there is no double jeopardy issue. Br. at 34. Money laundering

---

[4] Another aspect of the merger problem in *Santos* was the disparity in penalties between money laundering under 18 U.S.C. § 1956(a) (twenty years) and running an illegal lottery under § 1955(a) (five years). If running an illegal lottery is only serious enough to warrant a maximum of five years, it seems odd to say that the way a lottery necessarily works also constitutes an offense punishable by twenty years. But that problem is not present in Schultz's case. The penalty for money laundering under § 1957 is ten years, and the penalty for investment fraud is twenty. *Compare* 18 U.S.C. § 1957(a), (b)(1) *with id.* § 1343.

[5] Schultz must pay $850,000 in restitution. He does not challenge the amount.

requires proof of a transaction "by, through, or to a financial institution." 18 U.S.C. § 1957(a), (f)(1). Investment fraud does not. Wire fraud requires proof that electronic signals were sent by wire for the purpose of executing a fraudulent scheme. 18 U.S.C. § 1343. Money laundering does not. Each offense requires proof of an element the other does not. Money laundering and wire fraud are two different offenses. *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also United States v. Rude*, 88 F.3d 1538, 1546 (9th Cir. 1996) ("It is well established . . . that money laundering and wire fraud are separate offenses.").

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Schultz alleges ineffective assistance of counsel. If he had been represented by a lawyer who made the arguments Schultz makes, counsel would truly have been

ineffective. Schultz can protest his innocence and victimization at the hands of those who ran the high-yield investment scheme only by completely ignoring the fact that he lied to his investors in order to persuade them to give him their money. That the scheme did not pay off came as no surprise to Schultz, but that aspect of the case is not even central to his convictions. No reasonable person in his position would have chosen to go to trial; not only was conviction a certainty, but by pleading guilty, Schultz avoided additional charges. His attorneys' advice was plainly correct. Schultz fails to show any deception or confusion about the pellucid immunity agreement, and he fails to show any violation of it. Counsel did not fail to pursue a plausible line of defense that was raised at sentencing because there was no plausible line of defense. *United States v. Santos*, 553 U.S. 507 (2008), and *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), have no bearing on this case, because Schultz's fraud was complete when the investors gave him their money in reliance on his false promise to invest it. The loss calculation under the advisory Guidelines was correct, and there was no double jeopardy issue because wire fraud and money laundering each require proof of an element the other does not.

Schultz's claims are not only meritless but specious. None of them meets either prong of the *Strickland* test. There is no reason to encourage further proceedings. A certificate of appealability is not warranted.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Schultz's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (doc. 48) is DENIED on the merits;

2. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Schultz files a Notice of Appeal;

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 11-64-BLG-RFC are terminated and shall close the civil file by entering judgment in favor of the United States and against Schultz.

DATED this 30th day of June, 2011.

Richard F. Cebull, Chief Judge
United States District Court